USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #: _____
DATE FILED: 12/20/2017

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
UNITED STATES OF AMERICA,

                Plaintiff,

-and-

MARK MILANO,

                Intervening Plaintiff,

-against-

EMMANUEL O. ASARE, M.D., and
SPRINGFIELD MEDICAL AESTHETIC P.C.
d/b/a ADVANCED COSMETIC SURGERY OF
NEW YORK,

                Defendants.

15 Civ. 3556 (AT) (AJP)

**OPINION AND ORDER**

ANALISA TORRES, District Judge:

Plaintiff, the United States of America (the "Government"), and Intervenor-Plaintiff, Mark Milano (collectively, "Plaintiffs"), bring this action against Defendants Emmanuel Asare, M.D. ("Asare") and his former cosmetic surgery practice Springfield Medical Aesthetic P.C. ("Advanced Cosmetic"), alleging that Defendants violated the Americans with Disabilities Act of 1990 (the "ADA"), 42 U.S.C. § 12101 *et seq.*, and the New York City Human Rights Law ("HRL") by denying cosmetic surgery services to individuals with disabilities, particularly HIV. Plaintiffs move for summary judgment. ECF No. 87. Defendants cross-move for summary judgment on the Government's ADA claims unrelated to HIV. ECF No. 100. For the reasons stated below, Plaintiffs' motion is GRANTED in part, DENIED in part, and Defendants' cross-motion is GRANTED.

## BACKGROUND

This case arises from Asare's refusal to perform cosmetic surgery on three individuals: John Doe 1, John Doe 2, and Milano. In April 2014, John Doe 1 had an initial consultation with Asare for gynecomastia surgery. Pls. 56.1 ¶ 39, ECF No. 88. John Doe 1 and Asare scheduled the surgery, but Asare canceled it after test results suggested that John Doe 1 may be HIV positive. *Id*. ¶ 41. The parties dispute what, exactly, John Doe 1 and Asare discussed after cancellation or if a follow-up meeting took place. *Id.* ¶¶ 41–42. But the surgery did not go forward.

Similarly, in May 2014, John Doe 2 sought to have a gynecomastia surgery with Asare. *Id*. ¶ 28. John Doe 2 had an initial consultation, attended a pre-operative appointment, paid a deposit for the surgery, and, on May 21, 2014, appeared at Asare's office for the procedure. *Id.* ¶¶ 28–29. John Doe 2 was administered a sedative cocktail, including lorazepam, hydromorphone, and Benadryl. *Id*. ¶ 30. Before beginning the procedure, however, Asare canceled the surgery. *Id*. ¶ 31. Asare's notes from May 21 indicate that John Doe 2 had an elevated white blood count and tested positive for HIV. ECF No. 93-5. Asare scratched out the operative report, noting the "case cancelled due to lab results." *Id.*

Instead of rescheduling the surgery, Asare's May 21 notes indicate that he developed a "plan" whereby John Doe 2 would consult his primary care physician and repeat the HIV test in eight weeks. *Id.* Two days later, John Doe 2 came in for another appointment. Asare's May 23 notes state that he gave John Doe 2 a "[d]etailed explanation concerning his [elevated white blood count] and inconclusive HIV test." *Id*. The notes state that John Doe 2 agreed to meet with his primary care physician as well as other specialists. *Id.* John Doe 2 did not have HIV, however, and was not taking antiretroviral drugs. Pls. 56.1 ¶ 34.

Finally, in July 2014, Milano requested that Asare perform a gynecomastia procedure on him. *Id.* ¶ 14. At his initial consultation, Milano mentioned an HIV medication he had taken in the past. *Id*. ¶ 16. Asare asked Milano if he had HIV, and Milano confirmed that he did. *Id.* ¶ 17. Again, it is disputed what, exactly, Asare told Milano after this point, but the parties agree that Asare conveyed to Milano that he was not a suitable candidate for the gynecomastia surgery. *Id.* ¶ 18. Asare declined to perform the surgery. *Id.* ¶¶ 18–20.

On July 15, 2014, Milano filed a complaint about Asare with the Department of Justice. *See* Compl. ¶ 29, ECF No. 1; Milano Compl. ¶ 39, ECF No. 31. As a result, the Government launched an investigation into Asare and Advanced Cosmetic. Compl. ¶ 30. On or about September 19, 2014, the Government sent Defendants a letter requesting documents and information about its medical services to individuals living with HIV. *Id*. Asare responded to the Government by letter on December 10, 2014. ECF No. 93-4.

In the letter, Asare explained that "[a]ny condition that a patient has that to the best of my knowledge will potentially have any negative effect on the outcome of the surgery or recovery process will disqualify the patient." *Id*. Elaborating further, the letter listed "[e]xamples of cases I don't operate on." *Id*. One example was a "history of HIV infection." *Id*. Other examples included "obesity, uncontrolled diabetes, uncontrolled hypertension, recent stroke or heart attack, history of some types of cancer, history of DVT in the past, clotting disorders, history of active Hepatitis B and C as well as other chronic viral infections." *Id*. Asare concluded that "[j]ust like any other Cosmetic Surgeon, I have some qualifying and disqualifying criteria based on my comfort level and how much risk or stress I am willing to take![] I think that is my right as a Cosmetic Surgeon![]" *Id*.

On May 13, 2015, the Government filed a complaint under the ADA alleging that Defendants (1) have a policy of discrimination on the basis of disability, including HIV as well as other disabilities, and (2) discriminated against Milano. *See* Compl. Milano filed a motion to intervene, ECF No. 17, which the Court granted in February 2016, ECF No. 30. In addition to ADA claims, Milano brought claims under the HRL. *See* Milano Compl. ¶¶ 47–60. Plaintiffs now jointly move for summary judgment on their respective claims. ECF No. 87. Defendants oppose, and cross-move for summary judgment on the Government claims unrelated to HIV. ECF No. 100.

## DISCUSSION

I. <u>Summary Judgment Standard</u>

Summary judgment is appropriate when "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). As the Supreme Court has explained, "[o]nly disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment. Factual disputes that are irrelevant or unnecessary will not be counted." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).

To that end, "[t]he moving party bears the burden of demonstrating the absence of a material factual question, and in making this determination, the court must view all facts in the light most favorable to the non-moving party." *Connecticut Ironworkers Employers Ass'n, Inc. v. New England Reg'l Council of Carpenters*, 869 F.3d 92, 98–99 (2d Cir. 2017). "[I]f a movant meets his or her burden . . . , the nonmovant must introduce evidence to establish that a genuine dispute of material fact exists." *Id*. at 99.

The same standard applies to cross-motions for summary judgment. *United Indus. Corp. v. IFTE plc*, 293 F. Supp. 2d 296, 299 (S.D.N.Y. 2003). "The court must consider each motion independently of the other and, when evaluating each, the court must consider the facts in the light most favorable to the non-moving party." *Id*.

II. Application

    A. Americans with Disabilities Act Claims

The ADA prohibits discrimination on the basis of disability. *See* 42 U.S.C. § 12182(a). The statute defines discrimination in two ways, among others, that are relevant here. First, discrimination is "the imposition or application of eligibility criteria that screen out or tend to screen out an individual with a disability or any class of individuals with disabilities . . . unless such criteria can be shown to be necessary." *Id*. § 12182(b)(2)(A)(i). Second, discrimination is "a failure to make reasonable modifications in policies, practices, or procedures, when such modifications are necessary . . . , unless the entity can demonstrate that making such modifications would fundamentally alter the nature of such goods, services, facilities, privileges, advantages, or accommodations." *Id*. § 12182(b)(2)(A)(ii). Plaintiffs argue that Defendants have discriminated against individuals living with HIV in both ways.

        1. "Screen Out" Discrimination

As an initial matter, Defendants have conceded that they apply eligibility criteria that tend to screen out individuals living with HIV. Specifically, Defendants admit that they do not operate on "HIV+ patients taking antiretroviral medications." Defs. Mem. at 19 ("The defendants do not deny that Dr. Asare's determination that HIV+ patients taking antiretroviral medications are medically unsuitable for his procedures constitutes an eligibility criterion that tends to screen out a class of individuals with disabilities (persons with HIV) from his cosmetic

5

surgery services.").[1] As such, the sole remaining dispute for the purposes of the "screen-out" claim is whether applying the criteria is "necessary," and, therefore, permissible under the ADA.

As the Second Circuit has not given much content to the "necessary" defense in § 12182(b)(2)(A)(i) of the ADA, the defense is a matter of first impression. Other courts, however, have found that eligibility criteria can be considered "necessary" when they are imposed to ensure safety,[2] *Bauer v. Muscular Dystrophy Ass'n, Inc.*, 427 F.3d 1326, 1331–32 (10th Cir. 2005) (holding that the district court's finding that a summer camp's requirement that volunteers be able to lift and care for a camper was necessary for the safe operation of the camp was not erroneous); *Theriault v. Flynn*, 162 F.3d 46, 50 (1st Cir. 1998) (holding that it was permissible for a licensing officer to require an individual with an apparent lack of hand control to take a road test prior to renewing his license to operate a vehicle equipped with hand controls because "the safety of the public at large is implicated"), or to achieve the essential purpose of the services offered, *Easley by Easley v. Snider*, 36 F.3d 297, 303–04 (3d Cir. 1994) (holding that mental alertness was necessary to participate in an attendant care program whose essential purpose was to help the physically disabled).

---

[1] Although the parties dispute what criteria Defendants, in fact, apply, the question is irrelevant. As stated above, Defendants have already conceded that whatever policy they do apply tends to screen out individuals living with HIV. Still, for the sake of clarity, and viewing all facts in the light most favorable to the non-moving party, *Connecticut Ironworkers*, 869 F.3d at 98–99, the Court accepts that, as Asare has stated himself, *see, e.g.*, Asare Tr. at 135:22–24, and through counsel, *see, e.g.*, Defs. Mem. at 19, throughout this litigation, Defendants have a blanket policy against operating on individuals with HIV who are also taking antiretroviral medications.

[2] Indeed, regulations permit the imposition of "legitimate safety requirements," if necessary, as long as they are "based on actual risks and not on mere speculation, stereotypes, or generalizations about individuals with disabilities." 28 C.F.R. § 36.301(b). Defendants argue that these regulations are not meant to apply to medical judgments. As the Court does not base its decision on these regulations, however, it need not decide the applicability of the regulations.

Defendants argue that they do not operate on anyone taking antiretroviral drugs out of concern, as the law permits, for patient safety. But Defendants also go a step beyond this basic argument, maintaining "that medical decision-making is a specialized context that requires a cautious approach when analyzing disability discrimination claims." Defs. Mem. at 21. Citing mostly district court cases outside this circuit, Defendants argue that, for the purposes of the "necessary" defense, (1) Plaintiffs should be required to show that Defendants' stated reason for refusing to perform procedures on individuals taking antiretroviral drugs was pretextual, and (2) if Plaintiffs fail, Defendants' reason should be entitled to deference. *Id*. at 25.

As Plaintiffs point out, *see* Milano Reply at 6–8, Defendants' argument does not account for the Supreme Court's decision in *Bragdon v. Abbott*, 524 U.S. 624 (1998). Indeed, four out of the five cases Defendants rely upon pre-date *Bragdon*. *See* Defs. Mem. at 21–24. As *Bragdon* establishes "that courts should assess the objective reasonableness of the views of health care professionals without deferring to their individual judgments," *Bragdon*, 524 U.S. at 650, the Court rejects Defendants' outdated framework. The burden is on Defendants to show their criteria are "necessary," not on Plaintiffs to show that Defendants' reasons for the criteria are pretextual.

The Court, therefore, is once again faced with the question of whether Defendants' criteria are "necessary" to prevent, as Defendants argue, *see* Defs. Mem. at 26, any unsafe interactions between a patient's antiretroviral drugs and the sedative protocol Asare administers before surgery. Although a matter of first impression, the Court is not left without any guidance whatsoever. As Defendants recognize, *see* Defs. Mem. at 22–23 (relying on cases decided under the Rehabilitation Act), the ADA is to be interpreted consistently with the Rehabilitation Act, *see* 29 U.S.C.A. § 791(f); *see also Bragdon*, 524 U.S. at 638. Cases decided under the latter law

7

may provide guidance to cases brought under the former. *See Staron v. McDonald's Corp.*, 51 F.3d 353, 356 (2d Cir. 1995). For the purposes of this case, one case decided by the Supreme Court is particularly relevant.

In *Arline*, the Supreme Court held that a school board's decision to fire a teacher living with tuberculosis violated the Rehabilitation Act. *Sch. Bd. of Nassau Cty., Fla. v. Arline*, 480 U.S. 273 (1987). The school let the teacher go after she suffered three relapses of tuberculosis. *Id*. at 276. The district court upheld the school's decision without conducting an individualized inquiry into the health risks, if any, presented by the teacher's disease. *Id*. at. 277. The Supreme Court remanded to the district court for further fact-finding, reasoning that "[s]uch an inquiry is essential . . . [to] protect[] handicapped individuals from deprivations based on prejudice, stereotypes, or unfounded fear, while giving appropriate weight to such legitimate concerns of . . . avoiding exposing others to significant health and safety risks." *Id*. at 287.

Applying *Arline* to a "screen-out" discrimination claim brought under the ADA, the First Circuit has explained that "what is impermissible under *Arline* is rejecting an applicant *automatically* as a result of his disease or its symptoms, without considering the individual[]."[3] *Theriault*, 162 F.3d at 50 (emphasis added). The Court agrees with this interpretation of *Arline*.[4]

---

[3] In this way, the First Circuit's interpretation is consistent with the Supreme Court's decisions requiring an individualized inquiry under the "reasonable modification" provision of the ADA—the other ADA provision at issue in this case. *See PGA Tour, Inc. v. Martin*, 532 U.S. 661, 688 (2001) (explaining that "an individualized inquiry must be made to determine whether a specific modification for a particular person's disability would be reasonable under the circumstances as well as necessary for that person").

[4] Even cases Defendants cite to attempt to argue that health professionals are entitled to deference recognize the necessity of an individualized inquiry. *See, e.g.*, *Lesley v. Hee Man Chie*, 250 F.3d 47, 56 (1st Cir. 2001) (explaining that a doctor's decision to transfer a patient with HIV did not violate the ADA because the doctor's decision was "based upon a 'fact-specific and individualized' inquiry" (quoting *Arline*, 480 U.S. at 287)).

Here, it is undisputed that Defendants automatically reject potential patients taking any antiretrovirals. As Asare testified at his deposition, when a "person comes to [him and says], oh, okay, I'm HIV positive," he then asks that person "Are you on [the antiretroviral] cocktail?" Asare Tr. at 135:22–23. If yes, "[c]ase closed." *Id*. at 135:24. Asare does not investigate what type of antiretroviral drug a potential patient is taking or its possible effects, *id*. at 239:8–10 ("Q[:] So you're not concerned about any specific type of antiretroviral drugs, right? A[:] No."), including for Milano, *id*. at 308:7 ("I didn't research on Mr. Milano's drugs."). Asare acknowledged that some antiretroviral drugs are not contraindicated for the drugs in his sedative protocol, *id*. at 152:15–154:23, but did not investigate further because, as he testified, "I just don't feel comfortable," *id*. at 308:16–17.

Defendants' blanket refusal without individualized inquiry is insufficient to pass muster under the ADA. Indeed, with regard to Milano, Defendants' own medical expert stated that "[i]f it was me, I would have preferred to have had more history, information available prior to making a decision." Ehrenfeld Tr. 167:17–19. Without "some knowledge of that patient's medical history," the expert admitted, "you are not making [a] determination based on their medical necessity or medical history." *Id*. 170:12–18.

It is Defendants' burden to demonstrate that the application of any criteria screening out individuals with HIV was "necessary." Defendants cannot meet their burden when they automatically reject potential patients without "making [a] determination based on their medical necessity." Defendants have therefore run afoul of the ADA.

### 2. "Reasonable Modification" Discrimination

Plaintiffs additionally argue that, even if patient safety was a risk, Defendants violated the ADA's provision requiring them to make reasonable modifications. Plaintiffs urge that

9

Defendants should have (1) adjusted the sedative protocol preceding surgery, (2) hired an anesthesiologist to monitor or assist in the surgery, or (3) referred patients to another physician in the same practice. Gov't Mem. at 19; Milano Mem. at 18–19. However, as Defendants note, they are not in violation of the ADA if they "can demonstrate that making such modifications would *fundamentally alter* the nature of such goods, services, facilities, privileges, advantages, or accommodations." 42 U.S.C. § 12182(b)(2)(A)(ii) (emphasis added). Defendants argue that each of Plaintiffs' suggested modifications would either fundamentally alter the nature of the surgery or are not mandated by the ADA. As before, Defendants' failure to make an individualized inquiry is fatal to their arguments.

Title III of the ADA imposes a "basic requirement that the need of a disabled person be evaluated on an individual basis." *Martin*, 532 U.S. at 690. As such, the "refusal to consider [an individual's] personal circumstances in deciding whether to accommodate his disability runs counter to the clear language and purpose of the ADA." *Id*. at 688. Instead, "an individualized inquiry must be made to determine whether a specific modification for a particular person's disability would be reasonable under the circumstances as well as necessary for that person, and yet at the same time not work a fundamental alteration." *Id*. (citing See S.Rep. No. 101–116, at 61; H.R.Rep. No. 101–485, pt. 2, at 102, U.S.Code Cong. & Admin.News 1990, pt. 2, at pp. 303, 385 (public accommodations "are required to make decisions based on facts applicable to individuals")).

As explained above, Defendants admit that they refuse to perform cosmetic surgery on patients taking antiretroviral medications without making any further inquiry into their medical history or medical regimen. As in the context of "screen-out" discrimination, this fact is

10

dispositive. By failing to evaluate a person's disabilities "on an individual basis," *Martin*, 532 U.S. at 690, Defendants have violated the ADA.

### 3. Cross-Motion on Non HIV-Related Disabilities

Defendants cross-move for summary judgment against the Government only, arguing, essentially, that the Government has not demonstrated that Defendants have a policy or practice against *non* HIV-positive individuals with disabilities. Specifically, Defendants argue that Plaintiffs' only evidence of a policy or practice is Asare's letter of December 2014 and a print-out of anonymous online reviews of Asare. Defs. Cross. at 7. Without identifying a disabled individual who was denied services for a disability unrelated to HIV, Defendants contend, the Government's reliance on the letter and print-out is insufficient. *Id*. at 19–20.

As an initial matter, the Government is likely correct that the Defendants' distinction between HIV-related and non HIV-related claims is ill-advised. Gov. Reply at 25–26. The Government's complaint states claims for violations of the ADA, of which, as discussed above, Defendants' treatment of individuals living with HIV is proof. Nevertheless, to the extent that the Government's claims for individuals living with HIV and individuals living with other disabilities can be construed as distinct, the Government has failed to meets its burden with respect to the latter.

Unlike above, Defendants have not conceded that they apply eligibility criteria that tend to screen out individuals with other disabilities. *See* Defs. Cross. The Government is forced to rely solely on the December 2014 letter, print-out, and testimony from Asare which, in fact, details that he did perform surgery on an individual with another disability. Gov't Reply at 21–22. As the Government has not identified an instance where Asare has actually applied any screen-out criteria or refused reasonable modifications, this context presents a closer question

than the HIV context. Even taking all facts in the light most favorable to the non-moving party, as the Court must, *Connecticut Ironworkers*, 869 F.3d at 98–99, the documentary and testimonial evidence the Government presents only proves that Asare took a potential patient's medical conditions into account before performing surgery. Without more, therefore, the Court concludes that Defendants are entitled to summary judgment on the Government's claims unrelated to HIV. Whether the Court's conclusion has any material effect on this litigation is left to the remedies stage of this case.

> B. New York City Human Rights Law § 8-107

Beyond the ADA claims, Plaintiff Milano argues that Defendants have violated the New York City Human Rights Law (the "HRL") in two ways. First, Milano argues that Defendants violated the provision making it unlawful for any person or provider of a public accommodation to "refuse, withhold from or deny to such person the full and equal enjoyment, on equal terms and conditions, of any of the accommodations, advantages, services, facilities or privileges of the place or provider of public accommodation" on the basis of disability. N.Y.C. Admin. Code § 8-107(4). Second, Milano argues that Defendants violated the provisions requiring Defendants "to make reasonable accommodation to the needs of persons with disabilities." *Id*. § 8-107(15). As Defendants point out, Milano "relies on the same arguments and evidence he asserts in connection with his ADA claim." Defs. Mem. at 33. But Defendants maintain that "[e]ach of these points turns on disputed issues of material fact." *Id*. Defendants' argument must fail.

As Milano highlights, the relationship between federal law and the HRL "is now a one-way ratchet." *Loeffler v. Staten Island Univ. Hosp*., 582 F.3d 268, 278 (2d Cir. 2009). "Interpretations of New York state or federal statutes with similar wording may be used to aid in interpretation of New York City Human Rights Law, viewing similarly worded provisions of

12

federal and state civil rights laws as a *floor* below which the City's Human Rights law cannot fall." *Id*. (quoting Local Civil Rights Restoration Act of 2005, N.Y.C. Local Law No. 85 (2005)). As a floor, therefore, any violation of the ADA is automatically a violation of the HRL.

Although Defendants are correct that this case is replete with disputed facts, the Court's opinion rests only on that which is undisputed: Defendants' failure to make individualized inquiries. Accordingly, the Court's holding that Defendants' failure violated the ADA is dispositive. Defendants have also violated the HRL.

## CONCLUSION

For the reasons stated above, Plaintiffs' joint motion for summary judgment is GRANTED in part and DENIED in part. Specifically, Plaintiffs' motion is GRANTED as to HIV-related claims and DENIED as to non HIV-related claims. Defendants' cross-motion for summary judgment is GRANTED.

The Clerk of Court is directed to terminate the motions at ECF Nos. 87 and 100. By **January 10, 2018**, the parties shall file a joint letter informing the Court how they wish to proceed.

SO ORDERED.

Dated: December 20, 2017
      New York, New York

_____
ANALISA TORRES
United States District Judge