UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

```
┌──────────────────────────────────────────┐
│ USDC SDNY                                 │
│ DOCUMENT                                  │
│ ELECTRONICALLY FILED                      │
│ DOC #: _____                    │
│ DATE FILED: 8/5/2020_____                │
└──────────────────────────────────────────┘
```

UNITED STATES OF AMERICA,

                Plaintiff,

       -and-

MARK MILANO,

             Intervening Plaintiff,

      -against-

EMMANUEL O. ASARE, M.D., and
SPRINGFIELD MEDICAL AESTHETIC P.C.
d/b/a ADVANCED COSMETIC SURGERY OF
NEW YORK,

             Defendants.

15 Civ. 3556 (AT) (OTW)

**OPINION
AND JUDGMENT**

ANALISA TORRES, District Judge:

On May 6, 2015, Plaintiff, the United States of America, brought this enforcement action under Title III of the Americans with Disabilities Act of 1990 (the "ADA"), 42 U.S.C. § 12188(b)(1)(B)(i). *See* Compl., ECF No. 1. The Government alleges that Defendants, Emmanuel O. Asare, M.D. and his former cosmetic surgery practice, Springfield Medical Aesthetic P.C. ("Advanced Cosmetic," and collectively with Dr. Asare, "Defendants"), denied cosmetic surgery services to individuals with disabilities, including HIV, in violation of the ADA. *See generally id.* On February 10, 2016, Plaintiff-Intervenor, Mark Milano (together with the Government, "Plaintiffs"), filed an intervenor complaint alleging that Defendants denied him cosmetic surgery services on the basis of his HIV status in violation of the ADA and the New York City Human Rights Law ("NYCHRL"). *See* Milano Compl., ECF No. 31.

The Court held a bench trial from October 15 to 17, 2018.  ECF Nos. 189–191.

Following are the Court's findings of fact and conclusions of law pursuant to Federal Rule of

Civil Procedure 52(a).

## PROCEDURAL HISTORY

On July 15, 2014, Mark Milano filed a complaint with the Department of Justice alleging

that Defendants violated his rights under the ADA.  *See* Compl. ¶ 29; Milano Compl. ¶ 39.  As a

result, the Government began investigating Defendants.  Compl. ¶ 30.  On May 6, 2015, the

Government initiated this action under the enforcement provisions of the ADA, which permit the

Attorney General to (1) file a civil action when he or she "has reasonable cause to believe that . .

. [a] person or group of persons is engaged in a pattern or practice of discrimination," 42 U.S.C.

§ 12188(b)(1)(B), and (2) seek appropriate relief, "including monetary damages to persons

aggrieved," *id.* § 12188(b)(2)(B); *see* Compl.  On December 11, 2015, Milano filed a motion to

intervene, ECF No. 17, which the Court granted, ECF No. 30.  During discovery, the

Government notified Defendants of its intention to seek damages on behalf of two individuals,

J.G. and S.V.  *See* SJ Opinion at 5, ECF No. 154.

In 2018, the parties filed cross-motions for summary judgment.  ECF Nos. 87, 100.

Defendants conceded that when deciding whether to accept a patient who requests cosmetic

surgery services, Defendants apply eligibility criteria that tend to screen out individuals living

with HIV.  Defendants argued that their policy was based on legitimate concerns associated with

the interaction between antiretrovirals and the combination of medications Dr. Asare used during

surgical procedures.  SJ Opinion at 8–9.  The Court disagreed, holding that Defendants' policy

ran afoul of the ADA, based on two forms of discrimination:  (1) "screen out" discrimination,

because the undisputed evidence established that Defendants' policy constituted an application

of eligibility criteria that screened out those with disabilities, even though there was no evidence

that the policy was necessary for the provision of Defendants' services, *id.* at 11–12; and (2)

"reasonable modification" discrimination, as Defendants provided neither individualized

assessment of patients nor reasonable modifications to accommodate individuals taking

antiretroviral medications, such as hiring an anesthesiologist to supervise the surgery, *id.* at 11–

15.  Moreover, because Defendants conceded that they had refused to operate on Milano after he

disclosed his HIV-positive status, based on their policy, the Court held that Defendants violated

the ADA and NYCHRL.  *Id.* at 8–9, 12, 16.

The Court, however, denied the Government's motion for summary judgment as to J.G.

and S.V., concluding that what policy, if any, Defendants applied to them was a disputed issue of

material fact to be resolved at trial.  *Id.* at 9.  The Court also granted Defendants' cross-motion

for summary judgment with respect to the Government's claim that Defendants discriminate

against individuals with disabilities other than HIV.  *Id.* at 17.

From October 15 to 17, 2018, the Court conducted a bench trial on the following issues:

(1) Defendants' liability under the ADA with respect to J.G. and S.V., and any corresponding

claims for damages and injunctive relief, and (2) Milano's claim for compensatory damages

under the NYCHRL, as well as his claim for injunctive relief under both the ADA and

NYCHRL.  ECF Nos. 189–191; Pretrial Order at 2–3, ECF No. 184; Milano Pretrial Order at 2–

3, ECF No. 186.  At trial, the Government called J.G. and S.V.  *See* Trial Tr. 170:8–10, ECF No.

199; Trial Tr. 355:2–7, ECF No. 201.  Milano testified and called Lisa Fredrick as a witness.  *See*

*id.* at 170:2–7.  Dr. Asare testified on behalf of Defendants.  *See id.* at 355:8–9.  In rebuttal, the

Government called its expert witness, Charles Flexner, M.D.  *See* Trial Tr. 411:6–8, ECF No.

203.

At trial, both parties offered witnesses—Dr. Flexner and Dr. Asare—not qualified to speak to the standard of medical care in New York.  ECF No. 235 at 14.  After the close of trial, the Court granted in part Defendants' motion to strike the testimony of Dr. Flexner, striking those portions that concerned the standard of medical care in New York and New York State patient consent laws.  *Id.* at 13.   The need to appoint a neutral Court expert arose, therefore, because of both parties' failure to present admissible evidence on issues that lie at the heart of this case—that is, whether Dr. Asare treated certain patients in a lawful and medically appropriate manner.  *Id.*  Having found that a neutral expert was necessary, the Court issued an order on November 26, 2018, requiring the parties to show cause why the Court should not appoint an expert "to prepare a report, sit for a deposition, and testify at trial concerning all subjects raised in Dr. Flexner's testimony, pursuant to Federal Rule of Evidence 706(a)."  ECF No. 206.

On January 18, 2019, Defendants filed a petition for a writ of mandamus with the Court of Appeals, arguing that this Court was "using its inherent powers to assist the Government in its civil prosecution of . . . [D]efenants by appointing an expert witness to testify in place of Dr. Flexner."  Petition for Writ of Mandamus at 8, *In re Emmanuel O. Asare*, No. 19-187 (2d Cir. Jan. 18, 2019).  In February of 2019, this Court stayed the case pending the Second Circuit's decision on Defendants' petition.  ECF No.  221.  On April 30, 2019, the Court of Appeals denied Defendants' request for a writ of mandamus, holding that Defendants "have not demonstrated that they lack an adequate, alternative means of obtaining relief, that their right to the writ is clear and indisputable, or that granting the writ is appropriate under the circumstances."  *In re Emmanuel O. Asare*, No. 19-187 (2d Cir. Apr. 30, 2019); *see also* ECF No. 237.

Defendants' petition having been denied, the Court directed the parties to submit a joint letter identifying their agreed-upon expert. ECF No. 225. Upon review of the qualifications of three proposed candidates, the Court ordered that Timothy Wilkin, M.D., M.P.H., serve as the neutral expert. ECF No. 229. After Dr. Wilkin issued his report on August 5, 2020, ECF No. 241, the parties deposed him and submitted his deposition testimony in lieu of live testimony, along with certain objections from Defendants. ECF Nos. 241, 244, 251. The Court overruled Defendants' objections and admitted Dr. Wilkin's deposition as trial testimony. ECF No. 246. Post-trial briefing on Milano's claims was submitted in February of 2019, ECF Nos. 215–216, 222–223, and post-trial briefing on the Government's claims was completed in January of 2020, ECF Nos. 252–255.

The Court credits the testimony of J.G., S.V., Milano, Fredrick, and Dr. Wilkin. The Court also credits those parts of Dr. Flexner's testimony that were not stricken. *See* ECF No. 235 at 13. The Court rejects and does not credit key portions of Dr. Asare's testimony as described below.

## DISCUSSION

I.   Legal Standard

To prevail on their claims, Plaintiffs must prove a violation of Title III of the ADA by a preponderance of the evidence. *See Krist v. Kolombos Rest. Inc.*, 688 F.3d 89, 96 (2d Cir. 2012) (reviewing bench trial decision which considered whether plaintiff had established an ADA claim "by a preponderance of the evidence"). "The burden of showing something by a preponderance of the evidence simply requires the trier of fact to believe that the existence of a fact is more probable than its nonexistence." *Metro. Stevedore Co. v. Rambo*, 521 U.S. 121, 137 n.9 (1997) (internal quotation marks, citation, and alterations omitted). As the finder of fact, the

Court is entitled to make credibility findings about the witnesses and testimony and to draw

reasonable inferences from the evidence presented.  *See Merck Eprova AG v. Gnosis S.p.A.*, 901

F. Supp. 2d 436, 448 (S.D.N.Y. 2012), *aff'd*, 760 F.3d 247 (2d Cir. 2014).

II.   Findings of Fact

The Court's core findings of fact are as follows:  (1) Defendants refused cosmetic surgery

services to three individuals; (2) Defendants did so when they became aware that each individual

was either living with HIV, potentially living with HIV, or living with HIV and taking

antiretroviral drugs; (3) Defendants tested individuals without their consent in order to ascertain

their HIV status; and (4) each individual suffered emotional distress as a result of Defendants'

actions.

A.  Overview

In 2014, Defendants operated a plastic surgery practice with offices in Manhattan and

Long Island, New York.  Trial Tr. 215:16, 254:15–17, 365:13–366:13.  Dr. Asare is the sole

owner and officer of Advanced Cosmetics, and is solely responsible for all corporate policies and

decisions, including those pertaining to the selection of patients.  *Id.* at 365:17–366:9.  Dr. Asare

specialized in cosmetic surgery, including gynecomastia surgery, the removal of fat deposits

from a man's chest.  *Id.* at 15:14–22; 295:12–15.  In 2014, J.G., S.V., and Milano each sought

out Dr. Asare for the purpose of undergoing reduction mammoplasty.  *Id.* at 20:14–20, 173:10–

24, 213:19–215:5.

B.  J.G.

J.G. is a classically trained tenor who graduated from two preeminent schools of music.

He has performed in opera houses worldwide.  Trial Tr. 130:8–17, 151:7–10.  J.G. was

diagnosed with HIV in the spring of 2009, and began taking antiretroviral medication that same

year.  *Id.* at 130:18–19, 130:22–23, 133:2–4, 134:7–14.  In 2014, J.G.'s CD4 count, which is a

measure of the immune system, was within normal range, and his HIV viral load, which

identifies the measurable amount of HIV in one's system, was undetectable.  *Id.* at 135:1–136:1;

*see also* Wilkin Tr. 21:14–18, ECF No. 251.

Since adolescence, J.G. has dealt with "self-conscious and shameful feelings about

having a little extra tissue" in his chest.  Trial Tr. 136:12–15; *see id.* at 152:19–23.  After

researching different plastic surgeons, J.G. contacted Defendants to schedule an initial

consultation at Advanced Cosmetic, which took place on April 2, 2014.  *Id.* at 136:18–22,

137:17–24, 154:11–15.

At that visit, J.G. filled out paperwork, which included the question, "[d]o you have any

medical problems including the following: . . . HIV or AIDS."  *Id.* at 138:18–139:8 (internal

quotation marks omitted).  Although J.G. was living with HIV at the time, he marked "no" in

response.  *Id.* at 139:8–12.  J.G. explained that "the thought of sharing [his] HIV status was

something that . . . encompasses a lot of conflict, a lot of emotional stress and anxiety."  *Id.* at

139:14–16.  J.G. had not disclosed his HIV-status to his own family.  *See id.* at 132:10–17 ("I

decided very shortly after I found out about my status that my strategy would be to have a very

close circle[:] . . . my doctor, my best friend, and at that point my boyfriend . . . [a]nd I chose to

limit, you know, sharing my status to just them and to not talking about it with anyone else.");

*see also id.* at 131:24–132:9.

After completing the forms on April 2, 2014, J.G. met with Dr. Asare for the first time.

*Id.* at 141:18–21.  Dr. Asare explained his technique for conducting a reduction mammoplasty

and reviewed "before and after" photographs with J.G.  *Id.* at 141:22–142:3.  J.G. then scheduled

the procedure for June 6, 2014 and paid an initial deposit.  *Id.* at 142:4–17.  J.G. returned to Dr.

Asare's office on May 15, 2014, to pay the balance and to have his blood drawn for pre-surgical testing. *Id.* at 142:20–143:3. Approximately one week later, J.G. received a call from a scheduling assistant requesting that J.G. return to speak with Dr. Asare. *Id.* at 143:4–12.

A few days after that call, and about a week before his scheduled procedure, J.G. met with the doctor who informed J.G. that his blood work indicated that he had HIV, "and that it was [Dr. Asare's] policy—his office's policy—not to perform procedures on people with HIV." *Id.* at 143:13–23; *see also id.* at 144:15–16. J.G. responded that he (1) knew that he was living with HIV, (2) was currently on antiretroviral medications, (3) had an undetectable viral load, and (4) had a CD4 count in the normal range. *Id.* at 143:25–144:2, 144:7–10. According to J.G., Dr. Asare claimed that "it's really [his] nurses who would be freaked out. If they knew [J.G. was] HIV-positive[,] they would be too afraid of working on someone with HIV for fear of getting infected." *Id.* at 144:2–6, 144:17–18. Prior to this conversation, J.G. was "completely unaware" that Dr. Asare had tested his blood for HIV. *Id.* at 144:21–24. Neither the doctor nor anyone in his office had requested or received J.G.'s consent to perform an HIV test. *Id.* at 144:25–145:2. Dr. Asare concluded the meeting by telling J.G. to speak with the scheduling assistant to discuss a refund. *Id.* at 145:8–9.

Dr. Asare disputes J.G.'s recollection of this meeting; in fact, he denies that this meeting ever occurred. *Id.* at 332:6–13. Dr. Asare testified that he would have performed the surgery on J.G. once he was "cleared by his PCP or infectious disease guy," because "he's newly diagnosed HIV." *Id.* at 332:6–333:1. The Court does not credit Dr. Asare's account of the facts for several reasons. First, J.G. was not "newly diagnosed" with HIV, as Dr. Asare claimed. *Id.* at 332:23–25. J.G. had been living with HIV, and taking antiretroviral drugs, since 2009, and J.G. testified that he informed Dr. Asare of his HIV-positive status during their last meeting. *Id.* at 130:22–23,

133:2–4, 134:7–14, 143:25–144:2, 144:7–10.  Second, that there is no notation of this meeting in

J.G.'s medical file does not persuade the Court that the meeting never took place because of

glaring shortcomings in Defendants' medical recordkeeping.  For example, although Dr. Asare

claims that he obtained consent for HIV testing from all patients, there is no documentation of

consent in any of Defendants' records.  *See id.* at 351:7–352:5–6, 352:19–21, 358:23–359:3.

Nor does the doctor offer documentation indicating whether his employees actually reached out

to J.G. after the HIV test results came back, *see* Trial Tr. 332:3–5.  Third, although Dr. Asare

may have an incentive to lie, the same is not true for J.G.  J.G. testified in open court knowing

that if his HIV-positive status were to become public his career might be damaged.  *Id.* at

200:13–203:15.  J.G. noted for instance that a stage director may frown on J.G. kissing another

singer on stage, which would limit the roles J.G. could play.  *Id.* at 200: 19 –25.  Lastly, as is

discussed below, J.G.'s conversation with Dr. Asare is strikingly similar to those the doctor had

with S.V. and Milano.  The Court, therefore, credits J.G.'s testimony concerning his interactions

with Dr. Asare over Dr. Asare's account.

 After his consultation with Dr. Asare, J.G. stood on a street corner outside the doctor's

office and called his boyfriend, which is when all "the emotions started flooding" and he felt like

he was "transported back to the moment where [he] found out that [he] had HIV . . . feelings of

guilt and shame and sadness and anger and despair, feelings that [he] was not worthy of

someone's treatment because of [his] status."  *Id.* at 145:20–146:9.  J.G. "was consumed" with

these feelings for "several weeks," and experienced an "enduring . . . overall feeling of distrust

toward anyone else, medical professionals, or anyone knowing about [his] status,

because . . . [he] had just been treated in a way [he] didn't think was possible."  *Id.* at 146:10–

147:3.  J.G. testified that he "felt humiliated" and "like a second class citizen."  *Id.* at 146:12–15.

He sought help from a therapist, and remains negatively affected by this experience to this day. *Id.* at 114:10–15, 146:21–147:3.

      C.  S.V.

S.V. works as an underwriter of automotive loans.  *Id.* at 212:21–24.  He has two children and was planning to get married in September 2014.  *Id.* at 213:13, 217:3–4.  In advance of his "location wedding on a beach in Florida," S.V. decided to undergo gynecomastia surgery because he was not happy with certain areas of his body.  *Id.* at 214:3–8, 255:2–6.  In May 2014, after researching doctors, S.V. scheduled an initial consultation with Dr. Asare at his Long Island office.  *Id.* at 214:9–21, 215:5–16.

Upon arrival, S.V. was asked to fill out a number of forms.  *Id.* at 216:1–10.  S.V. suffers from a condition known as neutrophilic leukocytosis—abnormally high white blood cell count—and in 2014, was under the regular care of a hematologist, Steven Allen, M.D.  *Id.* at 230:25–231:11, 256:2–5.  Neutrophilic leukocytosis does not have an effect on S.V.'s day-to-day life and he is not required to take any medications.  *Id.* at 231:10–19.  When S.V. filled out the initial paperwork, he did not disclose the illness because his condition was not responsive to any of the questions on the forms.  *Id*. at 231:22–24, 232:1–3.  Nor had Dr. Allen advised S.V. that he should make mention of his illness before undergoing surgery.  *Id.* at 232:4–6.

On May 13, 2014, S.V. met with Dr. Asare for an initial consult.  Dr. Asare conducted a physical examination and explained the gynecomastia procedure.  *See* Pl. Ex. 2 at 1; Trial Tr. 311:2–312:15.  A few days later, S.V. paid for the surgery, and scheduled a preoperative visit for May 16, 2014.  *Id.* at 219:15–220:1, 220:19–22; 267:20–21; *see* Pl. Ex. 2 at 10.  On that day, employees of Advanced Cosmetic performed an EKG, took vitals, and drew blood.  Trial Tr. 220:23–221:9.  Defendants did not seek S.V.'s consent to conduct an HIV test.  *Id.* at 221:12–19.

On the morning of May 21, 2014, the day of the surgery, S.V. was driven by a car service to Defendants' facility in Commack, as recommended in Dr. Asare's preoperative instructions. *Id.* at 222:21–223:16; Pl. Ex. 2 at 17.  After arriving, S.V. put on a medical robe, and was taken into the operating area where a nurse gave him two or three lorazepam pills, a sedative.  *Id.* at 223:17–224:8.

Dr. Asare entered the room to mark the parts of S.V.'s body where the procedure would be performed, and then injected S.V. with a syringe containing hydromorphone, another, stronger sedative.  *Id.* at 224:20–225:4, 340:16–23.  Feeling tired, S.V. lay down, but was still able to hear, see, and comprehend what was happening around him.  *Id.* at 225:9–15.  About five minutes later, Dr. Asare re-entered the room, and declared that the procedure was cancelled because of the preoperative blood test results.  *Id.* at 225:21–23, 340:24–341:10.  Dr. Asare advised S.V. that testing indicated that S.V. was HIV-positive.  S.V. would later learn that he did not have HIV.  *Id.* at 225:24–25; 340:24–341:10; *see also id.* at 247:2–3.

Dr. Asare testified that although he had reviewed S.V.'s test results the day before, he had forgotten about them until after S.V. was administered the sedative cocktail.  *Id.* at 341:19–343:1.  Dr. Asare acknowledges that sedating a patient under such circumstances was a mistake. *Id.* at 320:7–9.  He testified that the test results were "quite abnormal, with a very high white blood cell count of 31,000," and that the HIV test was "inconclusive."  *Id.* at 315:6–16.  Dr. Asare said he was concerned about S.V.'s test results because "[f]irst of all, a very elevated white blood cell count could indicate a more serious problem like leukemia, in which case you cannot perform the surgery on the patient.  The second thing is the HIV status, which he never had a history of HIV.  So if it turns out to be positive, then it means it's a newly diagnosed HIV,

in which case you have to hold the surgery, counsel the patient, evaluate the patient to determine the stage of HIV disease the patient has before you go ahead." *Id.* at 316:4–14.

S.V. protested, insisting that he could not be HIV-positive, considering that his blood was drawn regularly under the care of his hematologist, who has never given S.V. an HIV diagnosis. *See id.* at 226:2–6. Dr. Asare reiterated, however, that the procedure was cancelled and directed S.V. to go home. *Id.* at 226:6–10, 343:2–4. Typically, when Dr. Asare performed a reduction mammoplasty, the process from preparation, to procedure, to discharge would take four hours. *Id.* at 343:5–9. This includes time for the patient to recover from surgery and for the sedative cocktail to start to wear off. But Defendants did not afford S.V. the time needed for the sedative to subside. *Id.* at 343:10–16. Instead, Defendants sent S.V. home by car service in a sedated state. *See id.* at 226:11–14 , 228:14 –19, 343:5–9.

S.V. was still "really groggy," "really tired," and felt "almost like [he was] walking sideways to try to get to the front door." *Id.* at 227:16–20. After finally getting inside, S.V. crawled on all fours up the stairs to his bedroom and lost consciousness. *Id.* at 227:23–228:9. He slept until 11 p.m. that night. *Id.* at 228:10–13. S.V. was shocked, nervous, and scared about the HIV diagnosis and began thinking about his children. *Id.* at 228:20–25. S.V. stayed up most of that night, pacing, "trying to understand what happened" and what Dr. Asare had told him. *Id.* at 228:20–229:1, 229:10–14. S.V. was so distraught that he contemplated suicide. *Id.* at 233:6–14.

Defendants did not call S.V. to check on him after he left their office. *Id.* at 239:6–7. Instead, Dr. Asare testified that he developed a plan whereby S.V. would consult his primary care physician and repeat the HIV test in eight weeks. Pl. Ex. 2; *see also* Trial Tr. 321:11–20.

The procedure would be rescheduled, only if the new test results were negative.  Pl. Ex. 2; *see also* Trial Tr. 321:11–20.

On May 22, 2014, S.V. contacted Advanced Cosmetic hoping to "get some information about what happened," but was told that Dr. Asare was not available.  *Id.* at 230:18–24.  After leaving a message with Advanced Cosmetic, *id.* at 230:23–24, S.V. called his hematologist, who referred him to North Shore Hospital's Infectious Diseases Department for a more conclusive HIV test.  *Id.* at 232:9–17.

On May 23, 2014, S.V. met with Dr. Asare who explained that S.V.'s blood test had come back HIV-positive.  Dr. Asare claimed he had to stop the procedure because "they weren't outfitted at that facility to do the surgery on someone with HIV."  *Id.* at 237:10–17, 238:11–14. S.V. reported that he suffers from neutrophilic leukocytosis and that his hematologist thought the test results could be a false positive.  *Id.* at 238:15–23.  S.V. insisted that he could not be HIV-positive, but Dr. Asare "clapped his hands and he said [S.V.] was HIV-positive."  *Id.* at 239:3–4; *see also id.* at 238:20–22 ("[Dr. Asare] went into some detail . . . on how [the test result] couldn't be a false positive.").  When S.V. asked whether it was legal or appropriate for Dr. Asare to not perform procedures on individuals living with HIV, the doctor asserted that "he is able to say yes or no [to any patient]."  *Id.* at 239:17–18.  Dr. Asare did not ask any questions about S.V.'s condition or whether he took any medications.  *Id.* at 240:5–10.  By the end of the conversation, S.V. understood that Dr. Asare would not perform the reduction mammoplasty because Dr. Asare believed that S.V. was HIV-positive.  *Id.* at 240:11–17.

After the meeting with Dr. Asare, S.V. went to North Shore and was administered an HIV test.  *Id.* at 242:7–15, 244:10–17.  On the following day, North Shore confirmed that he was not HIV-positive.  *Id.* at 247:2–3.

### D.  Mark Milano

Milano works as an HIV educator, writer, and editor at a research organization focused on HIV/AIDS.  *Id.* at 15–17.  He was diagnosed with AIDS in 1982, and began taking antiretroviral drugs in 2007, following a cancer diagnosis.  *Id.* at 14:8, 16:12–13.  Prior to 2007, he had been a "long-term nonprogressor" with a "healthy immune system."  *Id.* at 16:9–13.  Starting in 2008, Milano began developing fat deposits in his chest, *i.e.*, gynecomastia, and despite his efforts, had not been able to address it through diet and exercise.  *Id.* at 16:19–17:15, 18:7–15.  Milano's cancer recurred in 2010, but in 2014, he received a clean PET scan after four years without a recurrence.  *Id.* at 17:23–24, 17:24–18:5.  In July 2014, Milano started exploring the possibility of undergoing reduction mammoplasty, and scheduled an appointment with Defendants.  *Id.* at 18:13–19:12.

 On July 14, 2014, Milano met with Dr. Asare for an initial consultation at Advanced Cosmetic's Manhattan office.  *Id.* at 19:18–19, 56:14–18, 62:23–25.  Milano was asked to fill out a medical history form.  *Id.* at 20:4–6, 63:10–14.  Preferring to discuss his medical history in person with the doctor, Milano skipped those questions.  *Id.* at 20:7–10, 63:15–64:2, 308:20–23.  Following Dr. Asare's physical examination, Milano asked whether HIV medication that he had taken in the past could have caused or contributed to the gynecomastia.  *Id.* at 21:10–24.  According to Milano, Dr. Asare's demeanor then "changed significantly, and he got much more abrupt, and . . . said, you didn't check HIV on your form, in kind of an accusatory way."  *Id.* at 21:24–22:2.  Dr. Asare informed Milano that "it is [Defendants'] policy to never perform any procedures on any patients with Human Immunodeficiency Virus."  *Id.* at 22:9–17.  After Milano responded that such a policy is illegal, the doctor claimed that it was his "right as a doctor" to turn away "any patients that [he] feel[s] are medically inappropriate," including those living with

14

HIV.  *Id.* at 24:10–12; *see also* SJ Opinion at 14 ("Defendants admit that Asare told Milano he

was not a suitable candidate for the gynecomastia procedure as soon as Asare discovered that

Milano was taking antiretroviral medications, and without further inquiry" "into the patient's

medical history or medication regime.").

Dr. Asare disputes Milano's account of their meeting.  He claims that he did not use the

term "human immunodeficiency virus" because he has difficulty pronouncing it.  Trial Tr.

309:18–22.  But Dr. Asare's testimony is contradicted by Milano's detailed recollection of the

events, the testimony of J.G., *id.* at 143:22–23, and S.V., *id.* at 225:21–25, and by Dr. Asare's

own words in a December 10, 2014 letter to the Government, which confirmed that it was

Defendants' policy to not offer surgical services to patients with HIV, Pl. Ex. 4; *see also* Trial

Tr. 306:10–12.  The existence of such a policy is further supported by the fact that prior to July

2014, when Milano filed a complaint with the Department of Justice, Dr. Asare had not

performed surgery on any HIV-positive individuals.  Trial Tr. 303:22–304:16, 366:10–13

(admitted by Dr. Asare during his testimony and confirmed by his counsel in response to Court's

question seeking clarification on Dr. Asare's testimony).  The Court also rejects as not credible

Dr. Asare's assertion that he, a physician who has practiced medicine in the United States for

twenty-eight years and who testified in crisp, mellifluous English, struggles to pronounce the

term "human immunodeficiency virus."  *See id.* at 289:10–12, 309:18–22.

Milano testified that being summarily rejected by a doctor on the basis of his HIV status

was deeply traumatizing.  *See, e.g.*, *id.* at 67:21–68:10.  He explained that he "look[s] to the

medical profession almost as a salve against the stigma that [he] face[s] from uninformed people,

and to meet a doctor who was so cold and so uninformed, and so dismissive, was really

shocking."  *Id.* at 31:4–7.  "[T]here was something very different," he added, "about a doctor

saying I don't want to touch you . . . saying essentially I don't want you in my office because you're dirty, because you're infectious, just go away." *Id.* at 26:10–15. For Milano, the feelings he had in response to Dr. Asare's actions were comparable to the moment he learned he had cancer, "the sense of being different and apart from everyone else." *Id.* at 105:4–7; *see also id.* at 25:16–17. "When you have HIV, and when you're gay, you get a lot of rejection, a lot of stigma," Milano explained. *Id.* at 29:2–3. "[B]ut this incident was very stigmatizing, and I really felt like I was an awful person that a doctor didn't want to touch, so I was very hurt." *Id.* at 29:2–6.

For years after the incident, Milano experienced "continuing levels of anxiety . . . to the point where [he] even had to take Xanax at some point to get over the anxiety." *Id.* at 69:23–25. This anxiety "has been a continual stressor over the last four years. It's one more stress that has been added to the many stresses that [he] fought over the last 30 years . . . ." *Id.* at 98:10–13. Milano explained precisely why this incident provoked such enduring mental anguish:

> [I]t was the first time I experienced HIV discrimination from a provider, from somebody that I thought I could trust, it's a qualitatively different type of stress than I've ever experienced before, and . . . it adds an additional concern that this may happen again that I never had before Dr. Asare. I never had a significant worry before that I would be refused services because of my HIV status, and now I do, and that's something I never had before Dr. Asare, and so that is a new and distinctly different kind of stress than I had before meeting Dr. Asare.

*Id.* at 98:25–99:10.

In addition to the stress and anxiety arising from his interaction with Dr. Asare, he has suffered from persistent sleeplessness. *Id.* at 39:22–23; *see also id.* at 38:6–14, 38:17–19. Lisa Frederick, Milano's supervisor and co-worker for the past sixteen years, *id.* at 121:4, 121:8, testified about the effect Milano's experience with Dr. Asare had on his work performance. Prior to Dr. Asare's rejection of Milano, he was "a really integral part of [the] team" and the "go-

to guy." *Id.* at 123:14–5.  Afterwards, Milano "just seemed very lethargic, he was sad, he was

out of it.  He was just not who we know.  We're a small team, we work so close together, and we

just depended on him and he was just totally out of it and he just seemed to me to be extremely

sad, depressed, and he didn't look good." *Id.* at 128:21–129:1.  Milano's work performance

declined by "[a]t least 50 percent or more," *id.* at 125:9–12, and this lasted for "several months,"

*id.* at 129:2–4, 125:15–16.  In an email to his colleagues on July 15, 2014, Milano wrote, "I was

amazed at how much that hurt emotionally and psychologically.  Even after 25 years as an AIDS

activist it got to me.  I couldn't sleep last night after actually having a nightmare about him." *Id.*

at 32:2–5; Pl. Ex. 1.

   E.   Defendants' HIV Testing Regime

  Defendants test every preoperative patient for HIV infection.  Trial Tr. 350:7–18.  Dr.

Asare claims that HIV testing is necessary to determine whether a patient is an appropriate

candidate for surgery.  *Id.* at 366:22–367:1.  The Court is persuaded by the expert testimony of

Dr. Flexner and Dr. Wilkin that such testing is not medically necessary.

  "Universal precautions"—the practices and procedures used by all medical

professionals—involve assuming that a patient has an infectious condition.  *Id.* at 381:12–22;

Wilkin Tr. 31:4–19.  Universal precautions, adopted as common practice over thirty years ago,

have made testing every patient for HIV infection unnecessary.  *See* Wilkin Tr. 18:9–19:22 ("I

don't think that universal testing for HIV prior to elective surgery or minor elective surgeries is a

routine approach . . . [and] [i]t is not necessary."); *id.* at 31:20–25 (testifying that universal

precautions have "been in place since the HIV epidemic, so they began in the 80s"); *see also*

Trial Tr. 383:5–23 (Dr. Flexner testifying that "[w]ith the advent of universal precautions

17

. . . there was a turn away from this idea that everybody needed to be tested for HIV . . . prior to going off for high risk surgery").

Moreover, an otherwise healthy individual with controlled HIV, who is asymptomatic, is as appropriate a candidate for cosmetic surgery as any other healthy person. Trial Tr. 389:11–20; *see also id.* at 399:3–10 (Dr. Flexner testifying that "a patient who has a normal medical history and a normal physical exam and normal blood work—the kind of which Dr. Asare performs—but is also HIV infected, I believe that patient is at no greater risk of surgical complications than a person who is HIV uninfected with the same medical history"); *id.* at 149:3–9 (J.G. testifying that he told a subsequent cosmetic surgeon, "by the way, I'm HIV-positive. Is that a problem? And he didn't bat an eye.").

Defendants test patients for HIV prior to performing surgery, even though Dr. Asare is familiar with universal precautions. *See id.* at 349:24–350:6. And although there may be reasons to broadly test individuals for HIV in a variety of settings—for example, to connect those individuals to additional care, *see* Wilkin Tr. 19:25–20:15—the Court finds that the manner in which Defendants used HIV testing shows that providing individuals with appropriate care was not the purpose of such testing. For instance, Defendants never followed up with J.G. after learning that he was HIV-positive, or with S.V. about his inconclusive HIV results. It was only through S.V.'s repeated efforts that he was able to schedule a meeting with Dr. Asare to discuss the results. *See* Trial Tr. 230:18–24, 235:1–3, 237:10–14. This demonstrates that such testing was solely for the purpose of determining a patient's HIV-status, in order to deny medical care to those who were HIV-positive.

The secretive manner in which Defendants conducted HIV testing also contradicts Dr. Asare's "testing was necessary" explanation. The doctor acknowledged that in order to perform

HIV testing on patients he was required to first obtain consent from them and document such consent. *Id.* at 353:10–14; *see also* Wilkin Tr. 22:7–17. Defendants, however, never obtained consent from J.G. or S.V. *See* Trial Tr. 351:8–353:1, 358:23–359:3; *see id.* at 144:21–145:2, 221:12–19. Dr. Asare's explanation for his conduct is all the more suspect when considering that in failing to obtain consent, Dr. Asare violated the standard of medical care in New York. *See* Wilkin Tr. 25:21–24 ("Dr. Asare was not within the standard of care within the way that he conducted the HIV testing, meaning he conducted the testing without notifying the patient.").

Accordingly, the Court finds that testing patients for HIV prior to surgery was not medically necessary and rejects Dr. Asare's testimony to the contrary.

III.   Conclusions of Law

A.   Liability under Title III of the ADA

"The ADA was enacted to 'provide a clear and comprehensive national mandate for the elimination of discrimination against individuals with disabilities.'" *Henrietta D. v. Bloomberg*, 331 F.3d 261, 272 (2d Cir. 2003) (quoting 42 U.S.C. § 12101(b)); *see also* 42 U.S.C. § 12182(a). The statute states that "[n]o individual shall be discriminated against on the basis of disability in the full and equal enjoyment of the goods, services, facilities, privileges, advantages, or accommodations of any place of public accommodation by any person who owns . . . or operates a place of public accommodation." 42 U.S.C. § 12182(a). HIV infection constitutes a disability under the ADA. *Bragdon v. Abbott*, 524 U.S. 624, 630–31 (1998).

Title III of the ADA defines discrimination in several ways, two of which are relevant here. First, discrimination is "the imposition or application of eligibility criteria that screen out or tend to screen out an individual with a disability or any class of individuals with disabilities from fully and equally enjoying any goods, services, facilities, privileges, advantages, or

accommodations, unless such criteria can be shown to be necessary for the provision of the goods, services facilities, privileges, advantages, or accommodations being offered."  42 U.S.C. § 12182(b)(2)(A)(i).  Second, discrimination is "a failure to make reasonable modifications in policies, practices, or procedures, when such modifications are necessary to afford such goods, services, facilities, privileges, advantages, or accommodations to individuals with disabilities, unless the entity can demonstrate that making such modifications would fundamentally alter the nature of such goods, services, facilities, privileges, advantages, or accommodations."  *Id.* § 12182(b)(2)(A)(ii).

In its summary judgment opinion, the Court held that Defendants' policy of denying services to individuals who are taking antiretroviral drugs violated Title III of the ADA.  SJ Opinion at 11–12, 14–15, 17.  The Court, however, concluded that the question of what policy, if any, Defendants applied to J.G. and S.V. was to be resolved at trial.  *Id.* at 9.  The Court now concludes that Defendants applied the policy of denying services to individuals who are living with HIV and taking antiretroviral drugs to J.G., and a broader policy of denying services to anyone living with—or who Defendants believed to be living with HIV—to both J.G. and S.V., in violation of the ADA.

        i.    Individuals Living With HIV and Taking Antiretroviral Drugs

"The law of the case doctrine commands that when a court has ruled on an issue, that decision should generally be adhered to by that court in subsequent stages in the same case unless cogent and compelling reasons militate otherwise."  *Johnson v. Holder*, 564 F.3d 95, 99 (2d Cir. 2009) (internal quotation marks and citation omitted).  The Court's holding that Defendants' policy of denying services to individuals who are HIV-positive and taking

antiretroviral drugs constituted "screen out" discrimination and "reasonable modification" discrimination is the law of the case.  *See* SJ Opinion at 11–12, 14–15.

With respect to J.G., the record establishes by a preponderance of evidence that in 2014, he was living with HIV and taking antiretroviral medications.  Trial Tr. 130:22–23, 133:2–3, 134:7–14, 135:1–136:1.  Although it was medically unnecessary to do so, Dr. Asare performed preoperative HIV testing without J.G.'s consent.  *See* Wilkin Tr. 18:9–22, 19:20–22 (Dr. Wilkin discussing how universal precautions have made preoperative testing unnecessary); Trial. Tr. at 383:5–23 (Dr. Flexner stating the same); *see also id.* at 144:25–145:2.

In a May 29, 2014 meeting at Dr. Asare's office, right after J.G. disclosed that he had HIV and was taking antiretroviral medications, Dr. Asare cancelled J.G.'s surgery.  *Id.* at 143:25–144:10.  The sequence of events makes it clear that Dr. Asare called off J.G.'s reduction mammoplasty because he was HIV-positive and on antiretroviral medication.  But there is even more direct evidence:  during their meeting, Dr. Asare told J.G. that it was Defendants' policy "not to perform procedures on people with HIV."  *Id.* at 143:18–23.

Accordingly, the Court holds that the Government has proven, by a preponderance of the evidence, that Dr. Asare violated the ADA by applying a policy of denying service to individuals who are HIV-positive and taking antiretroviral medication.

ii.     Individuals Living With or Believed to be Living With HIV

Dr. Asare's policy of denying cosmetic surgery services, however, extended beyond individuals living with HIV and taking antiretroviral drugs.  The testimony of J.G., S.V., and Milano, along with Dr. Asare's own writings and notations prove, by a preponderance of the evidence, that it was Defendants' policy to refuse care to any individual living with, or potentially living with, HIV, regardless of the medications that person was taking.  *See* Trial Tr.

20:7–25:6, 143:20–144:20, 238:11–239:21; Pl. Ex. 4 at 1; Pl. Ex. 2 at 2.  As Dr. Asare told J.G.,

"it was his policy—his office's policy—not to perform procedures on people with HIV."  Trial

Tr. 143:18–23; *see also id.* at 22:9–17 (Milano testifying, "[Dr. Asare] turned to me, and he

spoke to me in a very formal—it felt like almost kind of a rehearsed way.  He said, Mr. Milano—

and I want to let you know these words are burned into my head, because I can hear him saying

them as I say it to you.  He said, Mr. Milano, I should inform you that it is our policy to never

perform any procedures on patients with the Human Immunodeficiency Virus.  And I remember

noticing he didn't say HIV, he actually very formally said 'with the Human Immunodeficiency

Virus.'").

The mechanism for implementing this broader "screen out" policy was Defendants'

practice of testing every preoperative patient for HIV.  *See id.* at 350:7–18.  Defendants tested

both J.G. and S.V., without their consent, and then used the results, which were positive in the

case of J.G. and inconclusive in the case of S.V., as justification for denying them cosmetic

surgery services.  *See id.* at 350:7–351:10 (Dr. Asare explaining that it was his practice to order

an HIV test for every surgical patient); *id.* at 144:25–145:2 (no consent to perform test on J.G.),

221:12–19 (or S.V.).  This practice constitutes illegal "screen out" discrimination because it

imposes an eligibility criterion for a service that screens out individuals who are or may be living

with HIV, a disability.  *See* 42 U.S.C. § 12182(b)(2)(A)(i).

A policy or practice that screens out individuals may not be discriminatory where "such

criteria can be shown to be necessary."  *Id.*  Although the Second Circuit has not yet defined the

"necessary" defense in § 12182(b)(2)(A)(i), other circuit courts have found that eligibility

criteria can be considered "necessary" when they are imposed to ensure safety, *Bauer v.

Muscular Dystrophy Ass'n*, 427 F.3d 1326, 1331–32 (10th Cir. 2005) (affirming the district

court's finding that a summer camp's requirement that volunteers be able to lift and care for a camper was necessary for the safe operation of the camp); *Theriault v. Flynn*, 162 F.3d 46, 50 (1st Cir. 1998) (holding that it was permissible for a licensing officer to require an individual with an apparent lack of hand control to take a road test prior to renewing his license to operate a vehicle equipped with hand controls because "the safety of the public at large is implicated"), or to achieve the essential purpose of the services offered, *Easley by Easley v. Snider*, 36 F.3d 297, 304 (3d Cir. 1994) (holding that mental alertness was necessary to participate in an attendant care program whose essential purpose was to help the physically disabled).

Although Dr. Asare contends that testing is necessary to assess whether potential patients are healthy candidates for surgery, Trial Tr. 366:22–367:1, the expert testimony of Dr. Flexner, *id.* at 383:5–23, and Dr. Wilkin, Wilkin Tr. 18:9–22, proves that this is false. They established that the advent of universal precautions has made preoperative testing unnecessary, Trial Tr. 384:2–385:3; Wilkin Tr. 314–32:9, and that an otherwise healthy individual with controlled HIV, who is asymptomatic, is as appropriate a candidate for cosmetic surgery as any other healthy person. *Id.* at 389:11–20; *see also id.* at 399:3–10.

The trial testimony and documentary evidence also contradicts Dr. Asare's assertions. Indeed, the record establishes, by a preponderance of the evidence, that Defendants' preoperative HIV testing served only to (1) identify individuals with HIV without providing meaningful information about the state of a patient's health, and (2) refuse services, or "screen out," those individuals. The evidence makes clear that it was a patient's HIV status, and not some other factor, that led to Defendants' denial of cosmetic surgery services. Dr. Asare testified that when a patient is newly diagnosed with HIV, a doctor should "[delay] the surgery, counsel the patient, evaluate the patient to determine the stage of HIV disease the patient has before you go ahead."

*Id.* at 316:4–14.  But Dr. Asare took none of those steps.  He did not "counsel" or "evaluate" J.G. or S.V.  He did not follow up with either of them to "determine the stage of HIV" before proceeding to reschedule the surgery.  Rather, Dr. Asare's treating relationship with J.G. and S.V. ended the moment he found out that they were, or could have been, HIV-positive.  Moreover, Dr. Asare's medical notes make it clear that he would only treat S.V. if the follow up test concluded that S.V. was HIV negative.  Pl. Ex. 2; *see also* Trial Tr. 321:11–20.  Such a practice, which unnecessarily screens individuals on the basis of possible HIV status, violates the ADA.

Accordingly, the Court finds that Defendants' policy of screening out individuals living with HIV through preoperative testing was applied to both J.G. and S.V., and runs afoul of the ADA.[1]

### B.  Damages, Penalties, and Other Relief

Upon a showing of liability in a civil action brought pursuant to Title III of the ADA, the Court may (1) grant "any equitable relief the court considers appropriate," (2) award "monetary damages to persons aggrieved when requested by" the Government, and (3) assess "civil penalt[ies] in an amount not exceeding [$75,000] for a first violation."  42 U.S.C § 12188(b)(2)(A)–(C); 28 C.F.R. § 36.504(a)(3)(i).  The Government seeks compensatory damages for J.G. and S.V.'s emotional distress suffered as a result of being subjected to Defendants' discriminatory policies, civil penalties of up to $75,000 per defendant, and injunctive relief requiring Defendants to institute ADA-compliant policies.  Gov't Post-Trial Br. at 24, ECF No. 252.

---

[1]  This is true despite the fact that S.V. was not, in fact, living with HIV because Dr. Asare believed that S.V. was HIV-positive when he cancelled S.V.'s procedure, and cancelled it for that reason.

Milano also seeks compensatory damages for emotional distress under the NYCHRL. Milano Post-Trial Br. at 15, ECF No. 214; *see also Duarte v. St. Barnabas Hosp.*, 341 F. Supp. 3d 306, 319 (S.D.N.Y. 2018) ("A plaintiff who prevails on a claim of discrimination under the [NYCHRL] may recover compensatory damages for emotional pain, suffering, inconvenience, mental anguish, loss of enjoyment of life, and other nonpecuniary losses." (internal quotation marks and citation omitted)).

The relationship between federal law and the NYCHRL is a "one-way ratchet." *Loeffler v. Staten Island Univ. Hosp.*, 582 F.3d 268, 278 (2d Cir. 2009). "Interpretations of New York state or federal statutes with similar wording may be used to aid in interpretation of [the NYCHRL], viewing similarly worded provisions of federal and state civil rights laws as a floor below which the City's Human Rights law cannot fall." *Id.* (quoting Local Civil Rights Restoration Act of 2005 § 1, N.Y.C. Local Law No. 85 (2005)). As a floor, therefore, any violation of the ADA is automatically a violation of the NYCHRL. Likewise, federal or state emotional distress damage awards in comparable discrimination cases must be viewed as a floor below which awards under the NYCHRL "cannot fall." *See* Local Civil Rights Restoration Act of 2005 § 1.

i.   Compensatory Damages

"In this circuit, emotional distress awards can generally be grouped into three categories of claims:  garden-variety, significant, and egregious." *Duarte*, 341 F. Supp. 3d at 319 (internal quotation marks, alterations, and citation omitted). "For 'garden variety' emotional distress claims, the evidence of mental suffering is generally limited to the testimony of the plaintiff, who describes his or her injury in vague or conclusory terms, without relating either the severity or consequences of the injury." *Id.* (internal quotation marks, alterations, and citations omitted).

"Such claims typically lack extraordinary circumstances and are not supported by any medical corroboration." *Id.* (internal quotation marks and citation omitted).[2] "Garden variety emotional distress claims generally merit $30,000.00 to $125,000.00 awards." *Id.* (internal quotation marks and citation omitted); *see also Lore v. City of Syracuse*, 670 F.3d 127, 177 (2d Cir. 2012) (affirming $150,000 award for emotional distress based on plaintiff's and her mother's testimony describing plaintiff's suffering, and observing that the Second Circuit has "affirmed awards of $125,000 each to plaintiffs for emotional distress resulting from age discrimination where the evidence of emotional distress consisted only of testimony establishing shock, nightmares, sleeplessness, humiliation, and other subjective distress" (internal quotation marks and citation omitted)). "Emotional distress damages are available even where the plaintiff has not sought medical treatment or the distress does not manifest in physical symptoms." *Saber v. N.Y. State Dep't of Fin. Servs.*, No. 15 Civ. 5944, 2018 WL 3491695, at *12 (S.D.N.Y. July 20, 2018).

Although no medical testimony was offered to corroborate J.G., S.V., or Milano's experiences, the testimony in this case, which detailed the severe psychological and emotional consequences of Defendants' actions, establishes that they are entitled to the higher end of "garden-variety emotional" distress damages. *See, e.g.*, *Lewis v. Am. Sugar Ref., Inc.*, 325 F. Supp. 3d 321, 367–68 (S.D.N.Y. 2018) (remitting jury award to $115,000 for "garden-variety" emotional distress); *Saber*, 2018 WL 3491695, at *13 (remitting award to $125,000 based on plaintiff's testimony); *Campbell v. Celico P'ship*, No. 10 Civ. 9168, 2012 WL 3240223, at *4 (S.D.N.Y. Aug. 6, 2012) (same); *Watson v. E.S. Sutton, Inc.*, No. 02 Civ. 2739, 2005 WL

---

[2] "'[S]ignificant' emotional distress claims are based on more substantial harm or more offensive conduct, are sometimes supported by medical testimony and evidence, evidence of treatment by a healthcare professional and/or medication, and testimony from other, corroborating witnesses." *Duarte*, 341 F. Supp. 3d at 320 (internal quotation marks and citation omitted). "'[E]gregious' emotional distress claims generally involve either 'outrageous or shocking' discriminatory conduct or a significant impact on the physical health of the plaintiff." *Id.* (citation omitted).

2170659, *16 (S.D.N.Y. Sept. 6, 2005) (remitting award to $120,000 based on plaintiff's testimony).

### 1.   J.G.

At trial, J.G. testified in detail as to the emotional distress he suffered as a result of Defendants' actions.  In May 2014, J.G. "had established a way to cope with living with HIV . . . [he] felt empowered" and "in control of [his] HIV."  Trial Tr. 136:2–10.  But these feelings of empowerment did not prevent the shock and humiliation J.G. felt when Defendants cancelled his surgery because of his HIV status.

J.G. was "stunned" when Dr. Asare cancelled the procedure because of his HIV diagnosis.  *Id.* at 145:22–23.  He tried "to keep everything emotionally together" until he got out of the office.  *Id.*  As he left Defendants' office, he "felt humiliated" and "like a second class citizen."  *Id.* at 146:14–15.  Once outside, he called his boyfriend to tell him what had happened, at which point "the emotions started flooding."  *Id.* at 145:25–146:5.  J.G. was "transported back to the moment when [he] found out [he] had HIV."  *Id.* at 146:5–6.

J.G. explained that when he was first diagnosed with HIV, he "[took] on what society tells you about [HIV-positive] people . . . that they're promiscuous, that they're dirty, [that] they're deviants."  *Id.* at 147:25–148:1.  J.G. had worked hard to overcome those feelings.  *Id.* at 148:3–4.  But when Dr. Asare declined to treat J.G. because of his HIV status, salt was poured into old wounds and J.G. began to re-experience the emotional pain he felt when he first learned he was HIV positive.  He experienced the same feelings of guilt; feeling "guilty that [he] had somehow been careless and let this happen, and sad for letting [his] family down, letting everyone [he] knew down."  *Id.* at 146:15–18.

27

J.G. testified that Dr. Asare's callousness and lack of professionalism transformed J.G.'s feeling of empowerment into "feelings of guilt and shame and sadness and anger and despair, and feelings that [he] was not worthy of someone's treatment because of [his] status." *Id.* at 146:7–9. "[A]ll of the work [he] had done for those years just personally all unraveled in a short period of time after meeting with Dr. Asare because . . . someone just proved to [him] that [he is] a second class citizen [and] . . . not worthy of being treated like a normal person." *Id.* at 148:4–9.

For the next several weeks, J.G. "was consumed and overwhelmed by these feelings of shame." *Id.* at 146:12–13.  He sought therapy "to cope with the feelings of shame and guilt" because they "were so overwhelming." *Id.* at 147:20–22.  J.G. saw a licensed therapist for seven to ten sessions from the summer of 2014 into the winter of 2015 to address those issues. *Id.* at 191:15–192:2.

In light of the detailed evidence presented, illustrating the severe emotional distress endured by J.G. over a period of years, and having surveyed the emotional distress awards in comparable cases, the Court finds that compensation in the higher end of the range for "garden-variety"[3] claims is appropriate.

Accordingly, the Court finds that J.G.'s traumatic experiences, resulting in significant feelings of humiliation, shock, and worthlessness, warrant an emotional distress award of $125,000. *See, e.g.*, *Patterson v. Balsamico*, 440 F.3d 104, 120 (2d Cir. 2006) (sustaining the jury's $100,000 compensatory damages award where "the plaintiff offered testimony of his humiliation, embarrassment, and loss of self-confidence, as well as testimony relating to his sleeplessness, headaches, [and] stomach pains"); *Lore*, 670 F.3d at 177.

---

[3]  The Court's use of the legal term "garden-variety" does not diminish the Court's conclusion that J.G., S.V., and Milano suffered severe psychological distress as a result of Defendants' discriminatory treatment.

2.  S.V.

S.V. also experienced severe emotional distress as a result of his interactions with
Defendants.  Defendants tested S.V. for HIV infection without his prior knowledge or consent.
Trial Tr. 221:12–19.  After administering a sedative cocktail, Dr. Asare erroneously informed
S.V. that he was HIV-positive and cancelled the procedure.  *Id.* at 341:19–343:1.  Before the
sedatives had worn off, Defendants sent S.V. home by car service, where he had to crawl on all
fours up the stairs to get to his bedroom.  *Id.* at 227:23–228:9.

S.V. lost consciousness once he made it to his bed.  *Id.*  When he awoke, his mind was
racing with fear of the consequences that such a diagnosis could have on his life and his family.
*See id.* at 228:21–25 ("[It] was hitting me that I was just told that I'm HIV-positive.  And I was
shocked, I was nervous, I was scared, I was thinking about my children.").  S.V. worried that he
would become a burden on his children, lamented the thought of their seeing him sick, and
feared that their roles would be reversed, with S.V. becoming the one in need rather than the
caretaker.  *Id.* at 233:6–11.  S.V. was so distressed that he contemplated suicide.  *Id.* at 233:9–14,
274:6–8.

From the moment on May 21, 2014, when Dr. Asare told S.V. that he was HIV-positive,
until May 24, 2014, when S.V. received the news, from a different source, that he did not have
HIV, he endured a psychologically painful state of uncertainty.  Receiving the initial news from
Dr. Asare was "a shocking blow."  *Id.* at 226:18.  S.V. was nervous and scared when he went to
North Shore for a second HIV test.  *Id.* at 242:2–3.  When he saw the health care providers at
North Shore, he broke down in tears, and had to be comforted by a physician's assistant that S.V.
had never met before.  *Id.* at 243:2–6.

The lasting impact of this experience cannot be doubted; to this day, S.V. continues to carry around the North Shore test results, as a reminder that he is not living with HIV.  *Id.* at 250:25–251:6.  The evidence presented, and relevant case law, supports the conclusion that an award at the higher end of the range for "garden-variety"[4] claims is appropriate to compensate S.V. for the emotional distress he endured.

Accordingly, the Court finds that S.V.'s traumatic experiences, resulting in his continuing feelings of shock, fear, nervousness, and suicidal thoughts, warrant an emotional distress award of $125,000.

### 3.   Mark Milano

Milano's emotional distress claim also satisfies the standard for an award at the highest end of "garden-variety"[5] claims.  He testified that being summarily and discriminatorily rejected by a doctor, on the basis of his HIV status, was deeply traumatizing.  *See, e.g.*, Trial Tr. 67:21–68:10; *id.* at 31:4–7 ("I look to the medical profession almost as a salve against the stigma that I face from uninformed people, and to meet a doctor who was so cold and so uninformed, and so dismissive, was really shocking."); *id.* at 26:10–15 ("[T]here was something very different about a doctor saying I don't want to touch you . . . saying essentially I don't want you in my office because you're dirty, because you're infectious, just go away."); *id.* at 29:2–6 (When you have HIV, and when you're gay, you get a lot of rejection, a lot of stigma . . . but this incident was very stigmatizing, and I really felt like I was an awful person that a doctor didn't want to touch, so I was very hurt.").

Milano described this experience as a "punch in the gut;" an experience that took his breath away.  *Id.* at 23:4–5.  He likened the pain to the feeling he had when he was diagnosed

---

[4]  *See* note 3.
[5]  *Id.*

with cancer.  *Id.* at 105:4–7 ("That feeling was the same that moment I got cancer and the moment that I was rejected by Dr. Asare, the sense of being different and apart from everyone else.").

Milano also provided substantial evidence of the consequences, and the duration, of his emotional distress, testifying that "the—anxiety and the—recurrent feelings of being dirty and unclean, those persisted very strongly for a long time afterwards."  *Id.* at 69:13–15.  He has suffered from continuing anxiety for years since the incident, anxiety that at times was so severe that he would take Xanax to cope.  *Id.* at 69:23–25, 70:20–71:2.  In addition, and related to, this stress and anxiety, Milano has experienced persistent sleeplessness due to this incident.  He had "difficult[y] falling asleep, difficulty staying asleep for a number of months thereafter."  *Id.* at 39:13–23.

Frederick, Milano's colleague and supervisor, corroborated Milano's testimony concerning the scope and duration of his emotional distress.  She testified that Milano's work performance declined by "[a]t least 50 percent or more," *id.* at 125:9–12, and that this lasted for "several months."  *Id.* at 129:2–6; *accord id.* at 125:14–20.  Frederick stated that Milano "was just totally out of it and he just seemed to be extremely sad, depressed" as a result of his experience.  *Id.* at 128:21–129:1.  Based on the evidence presented by Milano and Frederick, and the relevant case law, this Court holds that compensation at the higher end of the range for "garden-variety"[6] claims is appropriate to compensate Milano for his emotional suffering.

Accordingly, the Court finds that Milano's experiences, resulting in anxiety, stress, sleeplessness, and feelings of stigma and humiliation, warrant an award of emotional distress of $125,000.

---

[6] *Id.*

31

ii.   Civil Penalties

The ADA permits the Court to impose a civil penalty "to vindicate the public interest."

42 U.S.C. § 12188(b)(2)(C).  The Court may set civil penalties of up to $75,000 per defendant.

*Id.*; 28 C.F.R. § 36.504(a)(3)(i).  An "important characteristic" of civil penalties is to penalize

wrongdoing.  *Tull v. United States*, 481 U.S. 412, 423 n.7 (1987); *see also United States v.*

*Balistrieri*, 981 F.2d 916, 936 (7th Cir. 1992) (holding in the context of the Fair Housing Act,

which has the same relevant statutory language as the ADA, that "civil penalties . . . serve . . . a

purpose:  to punish wrongdoing").

At the summary judgment stage, the Court held that Defendants failed to perform an

individualized inquiry regarding the suitability of Milano for surgery in light of his HIV-positive

status and taking of antiretroviral drugs.  SJ Opinion at 12.  After trial, the Court found that

Defendants did not conduct an individualized inquiry with respect to both J.G. and S.V., and

instead, secretly performed HIV testing on them in order to screen them out.  Such conduct

violated the standard of care for medical professionals in New York.  Wilkin Tr. 25:21–24.

The type of individualized and objective inquiry that was absent here is compelled by the

ADA.  *See Bragdon*, 524 U.S. at 649 ("As a health care professional, petitioner had the duty to

assess the risk of infection based on the objective, scientific information available to him and

others in his profession.  His belief that a significant risk existed, even if maintained in good

faith, would not relieve him from liability.").  An individualized and objective inquiry is also

central to a physician's responsibilities to her patients.  *See Doe v. Deer Mountain Day Camp,*

*Inc.*, 682 F. Supp. 2d 324, 348 (S.D.N.Y. 2010) ("A health professional has a duty to assess the

risk of [HIV] infection based on the objective, scientific information available to her, and,

accordingly, her belief that a significant risk existed, even if maintained in good faith, will not

32

relieve [defendant] of liability [under the ADA]." (internal quotation marks, citation, and alterations omitted)).

Defendants' disregard of their duty to obtain the necessary consent from patients before administering HIV tests is equally troubling. Conducting individualized inquiries and obtaining consent before performing tests are at the core of what people expect from their physicians. Defendants failed to meet those obligations here. And as Milano explained in his testimony, the discrimination at issue in this case is all the more painful because it was inflicted by a doctor—a person whom a patient is supposed to be able to trust—and, of course, a person who has taken an oath to do no harm. *See id.* at 98:25–99:10.

Defendants argue that imposing a civil penalty would not be appropriate because there was no "intentional discrimination or malicious conduct by Defendants." Def. Reply at 6, ECF No. 255. Even assuming that Defendants' actions were not intentional, the ADA's prohibition against discrimination applies to "action that carries a discriminatory effect, regardless of . . . motive or intent." *Henrietta D. v. Giuliani*, 119 F. Supp. 2d 181, 206 (E.D.N.Y. 2000), *aff'd sub nom. Henrietta D. v. Bloomberg*, 331 F.3d 261 (2d Cir. 2003); *see also* H.R. Rep. No. 101–485(II), at 29 (1990), reprinted in 1990 U.S.C.C.A.N. 303, 310 ("Discrimination against people with disabilities results from actions or inactions that discriminate by effect as well as by intent or design."). Indeed, the applicable regulations state that Defendants cannot avoid civil penalties "simply by showing that [they] did not willfully, intentionally, or recklessly disregard the law." 28 C.F.R. Pt. 26, App'x C, Subpt. E.

Other courts have imposed civil penalties for ADA violations ranging from $10,000 to $50,000. *See Devinney v. Me. Med. Ctr.*, No. 97 Civ. 276, 1998 WL 271495, at *15 (D. Me. May 18, 1998) (hospital agreed to pay a $10,000 civil penalty for failing to provide auxiliary

aides and services to deaf patients); *United States v. AMC Entm't, Inc.*, No. 99 Civ. 1034, 2006 WL 224178, at *24 (C.D. Cal. Jan. 10, 2006) (imposing a $50,000 civil penalty on defendant for failing to provide ADA compliant seating at movie theaters across the country).

Accordingly, the Court finds that civil penalties are warranted to "vindicate the public interest." 42 U.S.C. § 12188(b)(2)(C). Given that Defendants operate a small medical practice, *see* Trial Tr. 215:16, 254:15–17, 365:13–366:13, and in light of the compensatory damages awarded to J.G., S.V., and Milano, the Court imposes a civil penalty of $15,000 ($5,000 per victim), payable to the United States.

    iii.    Injunctive Relief

The ADA empowers the Court to grant "any equitable relief the court considers appropriate, including . . . permanent relief." 42 U.S.C. § 12188(b)(2)(A). Plaintiffs have established that Defendants employ policies and practices that must be enjoined. Accordingly, Defendants are ENJOINED from: (1) performing HIV testing on every patient as a routine practice, and (2) conducting HIV testing on any patient without the patient's express consent; and ORDERED to institute, and conduct their medical practice in accordance with, written policies ensuring ADA compliance in the patient intake and screening process.

## CONCLUSION

For the reasons stated above, the Court holds that the Government has proven, by a preponderance of the evidence, that Defendants violated the ADA.

Accordingly, it is ORDERED that:

1.    Defendants must pay compensatory damages in the amount of $125,000 to J.G. and S.V. under the ADA, and to Milano under the NYCHRL;

2.    Defendants must pay to the Government a civil penalty in the amount of $15,000;

3.  Defendants are enjoined from (a) testing every patient to determine whether they have HIV, and (b) conducting HIV testing without patients' express consent; and

4.  Defendants are required to institute and adhere to written policies regarding ADA compliance in the patient intake and screening process.

The Court retains jurisdiction to monitor Defendants' compliance with the terms of this order.  The Clerk of Court is ordered to enter judgment against Defendants in accordance with this order and to close the case.

SO ORDERED.

Dated:  August 5, 2020
        New York, New York

_____
ANALISA TORRES
United States District Judge